NOT DESIGNATED FOR PUBLICATION

No. 123,638

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of A.K., A Minor Child.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; RICHARD A. MACIAS, judge. Opinion filed September 3, 2021. Affirmed.

*Laura E. Poschen*, of Law Office of Laura E. Poschen, of Wichita, for appellant natural father.

*Julie A. Koon*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before BRUNS, P.J., GARDNER and CLINE, JJ.

PER CURIAM: Father appeals the termination of his parental rights as to one of his minor children. Although he stipulated to the district court's finding of unfitness, Father contends that the district court erred in concluding that his unfitness is unlikely to change in the foreseeable future. After carefully reviewing the record on appeal, we find clear and convincing evidence to support the district court's findings and conclusions. We also find a preponderance of evidence in the record to support the district court's conclusion that termination of Father's parental rights is in the best interests of the minor child. As a result, we conclude that the district court did not err by terminating Father's parental rights to the minor child. Thus, we affirm the judgment of the district court.

FACTS

In early 2019, A.K. was born in Wichita. Two days later, A.K. was placed into protective custody because she tested positive for methamphetamine at the time of her birth. At the hospital, Mother admitted to frequent drug use throughout the pregnancy as well as recent periods of homelessness. A few days later, the State filed a child in need of care (CINC) petition on behalf of both A.K. and an older half-sister who is not the subject of this appeal.

The next day, the district court held a temporary custody hearing. Although Mother attended the hearing, Father did not appear. The district court found that there was probable cause to believe that the health and welfare of A.K. had been endangered and that it was in the infant's best interests to be temporarily placed in the custody of the Kansas Department for Children and Families (DCF). A few days later, Father was arrested for a parole violation.

About a month later, the district court held an adjudication hearing. Mother appeared at the hearing and did not contest the CINC petition. As a result, the district court adjudicated A.K. to be in need of care and ordered that she remain in DCF custody. Because Father had not been transported for the adjudication hearing, the district court continued the hearing as to Father.

The following month, the district court held an adjudication hearing as to Father. At the hearing, Father did not contest the CINC petition. Accordingly, the district court again adjudicated A.K. to be in need of care and ordered that she remain in DCF custody. Moreover, at the hearing, the district court accepted Father's acknowledgement of paternity.

Subsequently, the State filed a motion requesting that the district court find both parents to be unfit and to terminate their parental rights pursuant to K.S.A. 2020 Supp. 38-2266. Ultimately, Mother voluntarily relinquished her parental rights as to A.K. On the same day, Father stipulated to his present unfitness as a parent. Specifically, Father stipulated to unfitness on the basis of the following five statutory factors:

- "[T]he use of intoxicating liquors or narcotic or dangerous drugs of such duration or nature as to render the parent unable to care for the ongoing physical, mental or emotional needs of the child." K.S.A. 2020 Supp. 38-2269(b)(3).

- "[P]hysical, mental or emotional abuse or neglect or sexual abuse of a child." K.S.A. 2020 Supp. 38-2269(b)(4).

- "[C]onviction of a felony and imprisonment." K.S.A. 2020 Supp. 38-2269(b)(5).

- "[L]ack of effort on the part of the parent to adjust to the parent's circumstances, conduct or conditions to meet the needs of the child." K.S.A. 2020 Supp. 38-2269(b)(8).

- "[F]ailure to maintain regular visitation, contact or communication with the child or with the custodian of the child." K.S.A. 2020 Supp. 38-2269(c)(2).

On December 8, 2020, the district court held a termination hearing. At the hearing, the State presented the testimony of Grace Arzate—a permanency specialist with Saint Francis Ministries—and Ginger Hampton—a social worker and supervisor with Saint with Francis Ministries. In addition, Father testified on his own behalf. Also, Ledetra

Jones—the court-appointed Guardian Ad Litem—told the district court that she believed that it was in A.K.'s best interests for Father's parental rights to be terminated.

After considering the evidence and reviewing the court files, the district court determined that Father was unfit and that the condition was unlikely to change in the foreseeable future. Specifically, the district court found Father to be unfit under K.S.A. 2020 Supp. 38-2269(b)(4) because of "[p]hysical, mental or emotional abuse or neglect or sexual abuse of the children," and under K.S.A. 2020 Supp. 38-2269(b)(5) because of "[c]onviction of a felony and imprisonment." Finally, the district court concluded that the termination of Father's rights was in A.K.'s best interests.

In support of its conclusions, the district court made the following findings on the record:

> "Now, on September—September 15th of 2020, we had the testimony from [Father]. He had stipulated to present unfitness at the time. The unfitness to which he testified at that time, and today, the testimony he gave today also included the following. The criminal history already mentioned, 19 CR 1084, where he pled guilty to possession of methamphetamine, it's a level 5.
>
> . . . .
>
> "As I mentioned, [Father has] an extensive criminal history. Looks like it's primarily in the last ten years. At the sentencing that he just had, he was granted a downward departure. He was subject to, it looked like, 42 months. But the court gave a downward departure to 16 months. And [Father] testified that's indeed what he has, 16 months, to serve. And then afterwards, I believe he was going to look at six months to one year of post release supervision.
>
> "Additionally, the Court finds [Father] has five children from five different women. . . .

"The children range in ages from 13, . . . and the subject minor child [is] almost two years old.

"From the best the Court can tell, three of the children live with their respective mothers, one was adopted, and [A.K.] is currently in foster care DCF custody, and has been since her birth.

"According to [Father], he lost contact with the 13 year old when he was about 9 years old. . . . [I]t looks like one of the ten year olds, he'd only heard about, but he'd never met. And then [another child is] with the . . . maternal great grandparents . . . having been adopted.

"With respect to [another child] . . . [it] was hit and miss seeing the boy.

"With respect to [yet another child], the six year old, he's had no contact with since 2016. And that's when there was a violation of a no contact order.

"According to [Father's] testimony, he has not formally paid child support through the court. Reportedly he is subject to two child support orders on at least two of the children, and he says that he is behind in payments, child support payments.

. . . .

"[A.K.] is almost two years old. Unfortunately she does not know [Father]. She doesn't have a bond with him. Presumably, if anything, she's got a bond with the caretakers. I think it's been the only caretaker she's had since birth.

"[Father] will not be released for another 16 months. His intention then was to try to integrate the child with him. By his own accord, he thinks it will take at least four to six months once he got out of prison to establish himself, and perhaps even up to one year before reintegration may occur.

"Now, this makes many assumptions. First, of all, it will require a successfully completed sentence that [Father's] currently serving and including the post release. He

5

will need to secure employment. And as I mentioned earlier, he's not had ongoing gainful employment for approximately five years. He would go back to [automotive] detail and then work his way up as I said. He says he will complete drug treatment. And I mentioned before, he did that once before. But unfortunately suffered a relapse not long after. At least it seems like within a year after, thereabouts. At least we know it's nine months after release from prison.

"He'll need to secure a household. A household for himself. Initially he's going to live with his aunt, what he hopes. And then his own place. But that's, quite frankly, something that has not been consistent or stable for much of the last ten years.

"Ms. Arzate testified, and there was some testimony with respect to maintaining contact with [Father] while he's in jail, and that he said he would send some emails. Didn't always get an answer back, but I think he said he testified of the three he sent, he received replies on two. Ms. Arzate indicated that it turned out that they can no longer utilize that method for communication so she would have to send him a letter. That whenever she did get some word from him, some type of contact, that she endeavored to make a return by mail approximately two weeks from the time that she was requested to find out some information. And when she had the answers, that she would communicate with [Father]. The Court's going to find that that's not unreasonable under the circumstances.

"Ms. Arzate also said for this child to wait another what, in effect, would be 20 to 28 months, if we used the 16 plus four at a minimum, or the 12 at the outside, it is not in the best interest[s] for the child. She said you have to look at child time. Ms. Arzate said child time is what time the child's in DCF custody. Child needs permanency. Neither of which—well, permanency or stability, neither of which [Father] can presently, or in the foreseeable future, provide.

. . . .

"An additional 16 months, at a minimum, would be an extraordinary amount of time for [A.K.] to wait for permanency. And that would be the earliest.

6

. . . .

"[Father] made a comment that [he] thought . . . this biology connection is what's most important, and that's my words perhaps . . . but in [Father's] opinion, it's best to have [A.K.] wait. No child should have to [wait] for a parent.

"I don't know the circumstances of [A.K.'s] placement, but my guess is she's not wanting for anything right now. At least the testimony was she bonded with her caregivers. Unfortunately she doesn't know [Father]. And to delay any type of permanency for this child for another, you know, approximately two years, would certainly not be in her best interest[s].

"Please keep in mind, and this is why . . . these types of case must be decided in child's time. And that's set forth by Kansas case law. That's, *[I]n re C.C.*, 29 Kan. App. 2d 950, that's a 2001 case. And then pursuant to K.S.A. 38-2269(g)(1), when deciding these type[s] of cases, the court is required to consider the primary consideration to the physical, mental, and emotional health of the child and the needs of [A.K.]. It's the child that we have to look at this interest. Not [Father's] best interest. . . .

"Having previously made the finding of unfitness, and reaffirming that here today, that's also the judgment of the Court, and this is by clear and convincing evidence as to the unfitness and to the foreseeable future, that the conduct and condition which . . . makes this unfitness finding is unlikely to change in the foreseeable future, and even though we have an end date, and that end date is 16 months from now, given the tender years of this child, she will have been in custody—well, virtually all her life, and it will be at that point approximately four years old."

Consequently, the district court concluded that there was clear and convincing evidence of Father's unfitness under K.S.A. 2020 Supp. 38-2269(b)(4) and (b)(5). Although the district court found Father to be credible regarding his desire to have some visitation with A.K. during the pendency of this action, it noted that it could not be arranged because of Father's incarceration. Significantly, the district court found that "the best gauge we have for future success is past conduct." Highlighting Father's failure to

7

care and support his other children, the district court found that his "past conduct with parenting any of [his] children is below the standards . . . the law requires."

ANALYSIS

"Natural parents who have assumed parental responsibilities have a fundamental right to raise their children that is protected by the United States Constitution and the Kansas Constitution." *In re Adoption of C.L.*, 308 Kan. 1268, 1279, 427 P.3d 951 (2018). The right entails a fundamental liberty interest shielded in the Due Process Clause of the Fourteenth Amendment to the United States Constitution. See *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). Hence, parental rights for a child may only be terminated upon clear and convincing proof of parental unfitness. K.S.A. 2020 Supp. 38-2269(a); see also *Santosky v. Kramer*, 455 U.S. 745, 769-70, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014).

Nevertheless, "[t]he preservation of a father's relationship with his child is the starting point of a termination proceeding, not the finish line that a father must labor to reach." *In re Adoption of Baby Girl P.*, 291 Kan. 424, 433, 242 P.3d 1168 (2010). Under the revised Kansas Code for Care of Children, a district court may terminate parental rights only if it makes three findings:  (1) the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child; (2) the court finds by clear and convincing evidence that the conduct or condition that makes the parent unfit is unlikely to change in the foreseeable future; and (3) the court finds by a preponderance of the evidence that terminating the parental rights is in the best interests of the child. K.S.A. 2020 Supp. 38-2269(a), (g)(1); *In re R.S.*, 50 Kan. App. 2d at 1115-16; see also *In re D.H.*, 54 Kan. App. 2d 486, 488, 401 P.3d 163 (2017). Here, a review of the record reveals that the district court made all three findings and applied the appropriate legal standards in this case.

8

It is important to recognize that the sole issue presented on appeal is whether the State presented "clear and convincing evidence that Father's present unfitness was unlikely to change in the foreseeable future." In other words, Father does not challenge the district court's finding of present unfitness under both K.S.A. 2020 Supp. 38-2269(b)(4) ("[p]hysical, mental or emotional abuse or neglect") or K.S.A. 2020 Supp. 38-2269(b)(5) ("[c]onviction of a felony and imprisonment"). Likewise, Father does not challenge the district court's finding regarding the best interests of the minor child.

Consequently, we must determine whether clear and convincing evidence supports the district court's decision regarding Father's future unfitness. K.S.A. 2020 Supp. 38-2269(a). To do so, we must view the record in the light most favorable to the State—as the prevailing party below—to decide whether a rational fact-finder could have found it highly probable that Father's unfitness is unlikely to change in the foreseeable future. In reviewing the record, we are not to reweigh the evidence, pass on the credibility of witnesses, or redetermine factual questions. *In re Adoption of Baby Girl P.*, 291 Kan. at 430-31.

Although there is no set amount of time that constitutes the "foreseeable future" in a parental termination proceeding, K.S.A. 2020 Supp. 38-2201(b)(4) acknowledges "that the time perception of a child differs from that of an adult and [the State should] dispose of all proceedings under the code without unnecessary delay." Accordingly, Kansas courts are to measure time in a termination case based on "the child's perspective, not the parent['s], as time perception of a child differs from that of an adult." *In re S.D.*, 41 Kan. App. 2d 780, 790, 204 P.3d 1182 (2009) (finding a period of 11 months of incarceration not to be within the foreseeable future from a child's perspective); *In re M.B.*, 39 Kan. App. 2d 31, 47-48, 176 P.3d 977 (2008) (father had seven months of imprisonment remaining at the time of the termination hearing); *In re D.T.*, 30 Kan. App. 2d 1172, 1175, 56 P.3d 840 (2002) (father had 10 months of imprisonment remaining at the time of the termination hearing).

Of course, it is impossible to ever predict the future with absolute certainty. As a result, Kansas courts may reasonably look to the past conduct of a parent—as the district court did in this case—as being indicative of future behavior. See *In re K.L.B.*, 56 Kan. App. 2d 429, 447, 431 P.3d 883 (2018). In the present case, the State presented evidence to show that Father would not be released until he completed his 16-month prison sentence, and he would then be subject to a period of postrelease supervision. He would also need to reestablish himself in the community by finding a residence, getting a job, and maintaining stability. In addition, he would be required to successfully complete a parenting plan and be introduced into A.K.'s life over a period of time. Further, he would need to find a way to avoid drugs and criminal activity—which are serious concerns based on his prior history.

Examining the record, we find that the State presented evidence that A.K. was born in 2019 and tested positive for methamphetamine due to her mother's drug use during pregnancy. Within 36 hours of her birth, A.K. was placed into protective custody and continues to be in foster care. She has never had a relationship with Father who was arrested two weeks after A.K. was born and who has spent the majority of A.K.'s life in prison. At the time of the termination hearing, Father was serving a 16-month sentence and—by his own admission—would need up to a year to fully reintegrate back into society after his release.

This is not a case in which the district court terminated Father's parental rights simply based on his current incarceration. Rather, the district court also looked to the evidence presented by the State regarding Father's criminal and substance abuse history as well as to the very limited relationships he had with his four other children prior to his current incarceration. In announcing its decision, the district court found that Father has "an extensive criminal history" and, as a result, had "been incarcerated six to seven years" between the age of 18 and 33. In addition, the district court found that Father had been on parole or probation on several occasions.

10

We pause to note that Father suggests his inability to meaningfully participate in a parenting plan was due to circumstances beyond his control. However, the record reveals that the district court considered this argument in rendering its opinion. As a result, the district court did not find Father to be unfit due to a "[f]ailure to maintain regular visitation, contact or communication with the child or with the custodian of the child" pursuant to K.S.A. 2020 Supp. 38-2269(c)(2). Instead, as discussed above, the district court found Father to be unfit pursuant to K.S.A. 2020 Supp. 38-2269(b)(4) ("physical, mental or emotional abuse or neglect") or K.S.A. 2020 Supp. 38-2269(b)(5) and ("conviction of a felony and imprisonment"). Even more significant is the fact that Father stipulated that—at the time of the termination hearing—he was unfit to parent A.K., and the only issue presented on appeal is whether "the District Court erred in its determination that Father's present unfitness was unlikely to change in the foreseeable future."

As another panel of this court noted, "[w]e must judge these cases based mostly upon actions, not intentions, and we must keep in mind that a child deserves to have some final resolution within a time frame that is appropriate from that child's sense of time." *In re A.A.*, 38 Kan. App. 2d 1100, 1105, 176 P.3d 237 (2008). Viewing the evidence in the record in a light most favorable to the State, we find the evidence to be both clear and convincing evidence in support of the district court's determination that Father's unfitness is unlikely to change in the foreseeable future based on A.K.'s sense of time. Further, we find that the district court's consideration of the passage of time from A.K.'s perspective is consistent with the guidance provided by the Kansas Legislature in K.S.A. 2020 Supp. 38-2201(b)(4) as well as with Kansas appellate cases.

In conclusion, considering the evidence in the record in the light most favorable to the State, as we are required to do, we find clear and convincing evidence to support the district court's finding that the conduct or conditions rendering Father unfit to care for A.K. was unlikely to change in the foreseeable future, as viewed in light of a child's

11

perspective of time. In addition, we find that, under the circumstances presented, it was reasonable for the district court to conclude that termination of his parental rights—albeit a difficult decision—was in A.K.'s best interests. We therefore affirm the district court's order terminating Father's parental rights.

Affirmed.